## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ADVANCED OPTICS ELECTRONICS, INC.,
and BIOMODA, INC.,

      Plaintiffs,

vs.                                                                  No. CIV 07-0855 JB/DJS

LESLIE S. ROBINS, ALVIN D. ROBINS,
and JOHN W. KEARNS,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Leslie S. Robins' Motion to Dismiss

All Claims Brought by Advanced Optics Electronics, Inc. and Claims of Racketeering Brought by

Biomoda, Inc., filed October 9, 2007 (Doc. 15)("Motion to Dismiss").  The Court held a hearing on

January 22, 2008.  The primary issues are: (i) whether Advanced Optics Electronics, Inc. ("ADOT")

has authority to bring a suit against Defendant Leslie S. Robins given that ADOT's board of

directors has not authorized any such action; and (ii) whether Biomoda, Inc. ("Biomoda") has

sufficiently pled a case under the federal Racketeer Influenced and Corrupt Organizations Act

("RICO") and the New Mexico Racketeering Act ("Racketeering Act").  As discussed at the hearing,

because of the parties' reliance on information outside the Complaint, the Court will treat the motion

as a motion for summary judgment with regard to the issue of ADOT's authority to sue.  Because

the Court finds that, under Nevada law, ADOT is unable to commence a lawsuit against one of its

own directors without express authorization from its board of directors, which it does not have, the

Court will grant the motion for summary judgment on all of the claims brought by ADOT.  Because

Biomoda has not pled the elements of a RICO claim, the Court will grant the motion to dismiss with

respect to that claim, but will grant Biomoda leave to amend its Complaint.  Because Biomoda has adequately pled a civil racketeering claim under state law, the Court will deny the motion to dismiss Biomoda's Racketeering Act claim.

**FACTUAL BACKGROUND**

1.      **Facts Relevant to the Motion to Dismiss Racketeering Claims.**

For the purposes of a motion to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must assume that the allegations in the complaint are true.  Thus, the Court sets out the facts relevant to the Motion to Dismiss based upon the Complaint's allegations.

ADOT is a corporation organized under the laws of Nevada, with its principal place of business in Albuquerque, New Mexico.  See Complaint for Common Law Fraud, Violation of Federal and New Mexico Securities Laws, Conversion, Breach of Fiduciary Duty, and Racketeering ¶ 2, at 1, filed August 29, 2007 (Doc. 1)("Complaint").  It is a small, publicly held corporation engaged primarily in the development, production, and sale of electronic flat panel displays.  Its founder is Leslie Robins.

Biomoda is a corporation organized under the laws of New Mexico, with its principal place of business in Albuquerque, New Mexico as well.  See id. ¶ 3, at 1.  Biomoda was incorporated in 1990 by Ari Ma'ayan and others to license medical technology that Los Alamos National Laboratory patented.  See id. ¶ 8, at 2.

In 1998, Biomoda found itself in need of a capital infusion, and Biomoda sold approximately $470,000 worth of its outstanding stock to ADOT, giving ADOT a twenty-five percent interest in Biomoda.  See id.  ADOT also loaned money to Biomoda and acquired a security interest in Biomoda's assets.  See id.  At the same time Leslie Robins became a director of Biomoda.  See id. ¶ 10, at 2.  Several years later, on April 10, 2002, Ma'ayan stepped down from his position as

Biomoda's president.  See id. ¶ 11, at 3.  Robins became the new president, and John J. Cousins became vice president and a director of Biomoda.  See id.

In 2003, Biomoda again sought additional funds, and attempted to sell stock to the public in an S-B2 offer.[1]  The S-B2 offerings proved unsuccessful, however, and so Biomoda embarked on an effort to create a market for its stock through the OTC Bulletin Board.  See id. ¶¶ 13-14, at 3-4.  This equity effort required Biomoda to prove to NASD, the regulating agency of the OTC Bulletin Board, that its S-B2 offerings were terminated.  See id. ¶ 14, at 3-4.  The offerings were in fact "stale," and stock could only be sold under the S-B2 offerings with significant restrictions.  See id. ¶ 14, at 4.

Biomoda became listed on the OTC Bulletin Board, and at the end of 2006, its stock traded at $2.70 a share.  See id. ¶ 15, at 4.  In January of 2007, though, the share price plummeted sharply, and then dropped again in May through July of 2007.  Both drops were marked by heavy trading for a company of Biomoda's size.  See id.  Cousins began an investigation and determined that Robins was responsible for the declines, having flooded the market through various means.  See id. ¶ 16, at 4.

Among the methods Robins employed was having Defendant John W. Kearns write letters expressing the legal opinion that stock from the SB-2 offers could be issued and ordering the stock to be issued, and selling control stock that ADOT owned.  See id. ¶¶ 17-20, at 5-6.  Both activities were unauthorized, and Leslie Robins was aware of it.  See id.  Leslie Robins used entities controlled by himself and family to broker many of the shares.  See id. ¶ 22, at 6.  The shares were often issued with no consideration going to either ADOT or to Biomoda.  See id. ¶ 20, at 6.  Leslie

_____

[1] An SB-2 offering is a type of public stock offering for certain small companies, named for the associated Securities and Exchange Commission filing.

Robins' selling of large amounts of stock at below-market rates drove down Biomoda's share price. See id. ¶ 23, at 6.

After learning of Cousins' investigation, Leslie Robins transferred approximately $35,000.00 from Biomoda's account. See id. ¶ 24, at 6. Cousins also discovered that Leslie Robins had failed to have both Biomoda and ADOT pay their payroll taxes, had diverted ADOT funds and assets to his son, and had diverted an ADOT tax refund to himself. See id. ¶¶ 25-27, at 7. Leslie Robins also defamed Biomoda and ADOT and officers and employees of both, appropriated Biomoda business records, and prevented personnel from having access to the records of Biomoda and ADOT. See id. ¶¶ 28-29, at 8. Finally, Leslie Robins initiated unauthorized litigation by Biomoda against ADOT, and worked to damage Biomoda's reputation. See id. ¶¶ 30-31, at 8. Biomoda believes that Leslie Robins is seeking to "ruin Biomoda" so that he can foreclose on the company and acquire its assets. See id. ¶ 32, at 8-9.

**2.    Facts Relevant to Summary Judgment on ADOT's Claims.**

In 1996, Michael H. Pete was elected ADOT's president. See Exhibit B to Motion to Dismiss, Minutes of Written Consent in Lieu of a Special Meeting of the Board of Directors (executed November 7, 1996)(Doc. 15-2)("Minutes"). Pete remains the current ADOT president. He is also on ADOT's board of directors.

According to Leslie Robins, since his election, Pete has had no role in management of the company, has not received a salary, and has had no significant involvement in ADOT's operations. Pete has never been compensated as an employee of ADOT, and he has not heretofore participated in any of the decisions regarding ADOT's management and business activities. See Declaration of Leslie S. Robins ¶ 14, at 3 (executed December 19, 2007)(Doc. 49-2)("Robins Dec."). Pete lives full time in Washington, D.C., and has been present in ADOT's Albuquerque offices only one or

two days a year since his election as president some eleven years ago. <u>See</u> <u>id.</u> ¶ 11, at 3. For these visits, Pete was paid a consulting fee. He has not been paid a consulting fee or any other remuneration during the year 2007. Pete has not visited ADOT's offices at anytime during the year 2007. <u>See</u> <u>id.</u> Before this case, Pete had never hired counsel on ADOT's behalf or initiated litigation. <u>See</u> <u>id.</u> ¶ 15, at 3-4.

Leslie Robins says he has always been the ADOT executive in charge of hiring counsel and bringing litigation on ADOT's behalf. It was he who interviewed and selected every attorney that ADOT previously retained for any purpose. <u>See</u> <u>id.</u> ¶ 8, at 2-3. Moreover, every litigation decision made in the course of all litigation involving ADOT, including the final resolution or settlement, was always Leslie Robins' province. <u>See</u> <u>id.</u> ¶ 9, at 3. Neither ADOT's board nor Pete have ever previously challenged Leslie Robins' authority to retain counsel for ADOT or to initiate litigation on ADOT's behalf. <u>See</u> <u>id.</u> ¶¶ 8-10, at 2-3.

Cousins is a vice president of ADOT. <u>See</u> Affidavit of John J. Cousins ¶ 4, 1 (executed January 7, 2008)(Doc. 57-2)("Cousins Aff."). According to Cousins, Leslie Robins is not president of ADOT, but was elected Chief Executive Officer at the same time Pete became president. <u>See</u> <u>id.</u> ¶ 4, 1.

ADOT's bylaws invest the ADOT Board of Directors "with the complete and unrestrained authority to manage the affairs of the corporation." Bylaws § 2.14. An affirmative vote of a majority of the Board at a meeting at which a quorum is present "shall be the act of the Corporation." Bylaws § 2.13. ADOT's president is "the general manager and executive officer of the corporation, subject to the supervision and control of the Board of Directors, and shall direct the corporate affairs, with full power to execute all resolutions and orders of the Board of Directors not especially entrusted to some other officer of the corporation." <u>Id.</u> § 3.04.

The Board chairman's role is limited to presiding at board meetings, see id. § 2.16(a), and calling special meetings, see id. § 2.07.  The chairman is required to call a special meeting upon the request of two directors or of the president.  See id. § 2.07.  The bylaws do not provide for a chief executive officer, chief operating officer, or any other chief officer other than the president.  The vice president is vested with all the president's power and duties whenever the president is absent or unable to act.  See id. § 3.05.

## PROCEDURAL BACKGROUND

Biomoda and ADOT, with ADOT acting through counsel whom Pete hired, initiated this action against Leslie Robins, his brother Alvin D. Robins, and Kearns.  See Complaint.  ADOT and Biomoda sued Leslie Robins on numerous federal and state causes of action, including for conversion, civil conspiracy, breach of fiduciary duty, negligence, defamation, and racketeering. In the Complaint, ADOT does not affirmatively state what corporate authority it had to bring this lawsuit.  Phil Krehbiel entered a notice of appearance for ADOT.  See Notice of Appearance, filed August 29, 2007 (Doc. 2)("Krehbiel's Notice").

Leslie Robins moves the Court to dismiss all of ADOT's claims against him and to dismiss Biomoda's racketeering claims.  See Motion to Dismiss.  According to Leslie Robins, ADOT has not been authorized to bring this lawsuit, requiring dismissal of all its claims.  Leslie Robins also argues that the racketeering counts against him must be dismissed because Biomoda has failed to set forth a pattern of racketeering activity.

On November 2, 2007, Biomoda and ADOT filed their response to the Motion to Dismiss. See Plaintiffs' Response in Opposition to Motion to Dismiss, filed November 2, 2007 (Doc. 27)("Response"). The Plaintiffs asserted that ADOT's president, Pete, had authorized ADOT to sue Leslie Robins.  They argued that ADOT's bylaws gave Pete the power to authorize such litigation,

and that the bylaws were silent on Leslie Robins' authority, meaning that he lacked the authority to declare the lawsuit against him ultra vires. See id. at 2. The Plaintiffs also contested Leslie Robins' argument that the Court should dismiss Biomoda's racketeering claims. They pointed to a number of actions by Leslie Robins alleged in the Complaint as being acts of racketeering, and argued that they were part of a pattern because they were pursuant to an overall plan by Leslie Robins and others to eliminate Biomoda and gain control of its assets. See id. at 2-7.

On December 19, 2007, John Boyd and Matthew L. Garcia of Freedman Boyd Hollander Goldberg & Ives, P.A., an Albuquerque law firm, entered a competing notice of appearance on ADOT's behalf. See Notice of Appearance, filed December 19, 2007 (Doc. 47)("Boyd's Notice"). That same day, also on ADOT's behalf, Boyd moved to strike Krehbiel's Notice. See Advanced Optical Electronic, Inc.'s Motion to Strike Phil Krehbiel's Entry of Appearance, filed December 19, 2007 (Doc. 48). Krehbiel, also on ADOT's behalf, then moved to strike Boyd's Notice. See Advanced Optical Electronic, Inc.'s Motion to Strike the Entry of Appearance of Freedman Boyd Hollander Goldberg & Ives, P.A., filed January 7, 2008 (Doc. 52). Mr. Krehbiel and Mr. Boyd each contended that the other did not have authority to represent ADOT.

The Court held a hearing on January 22, 2008. The Court indicated that it did not believe that the motions to strike were the proper way of resolving the competing appearances on behalf of ADOT, both because they were procedurally inappropriate and because the underlying issue seemed to be a disputed factual issue about who had authority to hire counsel for ADOT. See Transcript of Hearing at 5-7, taken January 22, 2008 (Court)("Tr.").[2] The Court expressed its concern that the issue of who had authority at ADOT could not be resolved without a trial. See id. at 15-16. Mr.

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Krehbiel admitted that there was no direct authorization from ADOT for the lawsuit, but that the bylaws had delegated authority to the president, Pete.  See id. at 18 (Krehbiel).  At the parties' request the Court took a recess, and when Court resumed, Mr. Krehbiel and Mr. Boyd stated that they would withdraw their motions to strike, and would later reassert them on summary judgment if necessary.  See id. at 23-24, 26 (Krehbiel), (Boyd).

Mr. Krehbiel agreed that, because of the reliance on affidavits in contesting the motion to dismiss, the Court should convert the motion to dismiss into a motion for summary judgment.  See id. at 31 (Boyd).  Mr. Krehbiel admitted that there was no formal board authorization, but did not concede that the suit was improperly filed.  See id.  The Court gave formal notice that the motion to dismiss would be converted into one for summary judgment with respect to the issue of ADOT's authority to sue, and invited the parties to submit supplemental briefing.  See id. at 46-47.  The Court also stated that it planned to deny the motion to dismiss the racketeering claims, but would give notice if its further research into the law suggested another result.  See id. at 48.

Opposing supplemental responses on ADOT's behalf were filed after the hearing. See Plaintiff's Supplemental Response to Motion by Defendant Leslie S. Robins to Dismiss All Claims Brought by Plaintiff Advanced Optics Electronics, Inc. (Document No. 15), filed February 1, 2008 (Doc. 71)("Plaintiff's Supplemental Response"); Advanced Optics Electronics, Inc.'s Supplemental Memorandum in Support of Leslie Robins' Motion to Dismiss the Claims of Advance Optics Electronics, Inc., filed February 1, 2008 (Doc. 72)("Defendant's Supplemental Memo."). The Plaintiff's Supplemental Response reiterated the argument that ADOT's bylaws authorized Pete to initiate the lawsuit, and that he also had implied authority to do so, absent some opposition by the board.   The Defendant's Supplemental Memo. argued that, without the board's express authorization, ADOT could not bring a lawsuit against Leslie Robins.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGEMENT

Summary judgment is appropriate where the movant demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See also Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir.1995)("Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.")(internal quotations omitted).  Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).

The movant bears the initial burden of showing that there is an absence of evidence to support the non-moving party's case.  See La Casa de Buena Salud v. United States, No. CIV 07-238 JB/RHS, 2008 WL 2323495 at *14 (D.N.M. March 21, 2008)(Browning, J.)(citing Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.1991)).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324.  When the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "[W]here the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Paul v. Monts, 906 F.2d 1468, 1474 (10th Cir. 1990)(internal quotations omitted).

## LAW REGARDING RULE 12(b)(6)
## OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, and view those allegations in the light most favorable to the non-moving party and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991). A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (internal citation omitted). "[T]he [Supreme] Court [of the United States] recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir.2007)(quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1967, 1969 (2007)). "The Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly,

127 S.Ct. at 1974.)(alterations omitted).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177.

In resolving a motion to dismiss brought under rule 12(b)(6), the court must determine whether the factual allegations are sufficient "to raise a right to relief above the speculative level," while assuming "that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S.Ct. at 1965 (internal quotation marks omitted).

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." [Bell Atl. Corp. v. Twombly, 127 S Ct.] at 1974.  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

> This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them.  "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  [Bell Atl. Corp. v. Twombly, 127 S.Ct.] at 1965 n. 3.  See Airborne Beepers & Video, Inc. v. AT & T Mobility L.L.C., 499 F.3d 663, 667 (7th Cir. 2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").  The Twombly Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." 127 S. Ct. at 1971 n. 10. Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin."  Id.

Robbins v. Oklahoma, 519 F.3d at 1248.

## RELEVANT LAW REGARDING NEVADA CORPORATIONS

Like other states, Nevada gives corporations the authority "to sue or be sued in any court of law or equity." N.R.S. 78.060(2)(b).  Nevada law vests "full control over the affairs of the

-11-

corporation" in the board of directors, subject to other statutory provisions and restrictions in the corporation's articles of incorporation. Id. 78.120. Nevada law requires that every corporation have a president, a secretary, and a treasurer. Other officers are optional. All officers have "such powers and duties as the bylaws may prescribe or as the board of directors may determine." Id. 78.130.

Nevada law provides several options for dealing with internal conflicts and allegations of malfeasance within a corporation. Two-thirds of the shareholders of a corporation may vote to remove a director from office. See id. 78.335. The holders of ten percent or more of the issued and outstanding stock of a corporation "may apply to the district court, held in the district where the corporation has its principal place of business, for an order dissolving the corporation and appointing a receiver to wind up its affairs." Id. 78.650. This provision may be invoked in a variety of circumstances, including when the corporation is unable to conduct business because of the "act, neglect or refusal to function of any of the directors," or because of malfeasance or fraud by directors. Id. And when the corporation's business "is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that a required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division[,]" any shareholder, regardless of his or her relative voting power, may apply for a court order appointing a custodian or receiver to take control of the corporation. Id. 78.347(1)(a). Finally, any shareholder may bring a shareholder derivative suit if the corporation has "failed to enforce a right which may properly be asserted by it." Nev. R. Civ. P. 23.1.

## LAW ON CORPORATE AUTHORITY TO SUE WITHOUT BOARD PERMISSION

There is no clear rule about when a corporation can initiate litigation without the authorization of its board of directors. The majority of states allow the president of a corporation,

or a similar executive officer, to generally authorize litigation, unless the board has specifically

acted to forbid or constrain the president from doing so.  See W. FLETCHER, FLETCHER CYCLOPEDIA

OF THE LAW OF PRIVATE CORPORATIONS § 618, at 141 (perm. ed. 2001)

Management Technologies, Inc. v. Morris, 961 F.Supp. 640 (S.D.N.Y. 1997), allowed

emergency action in the face of a deadlocked board, but the action did not involve suing any of the

deadlocked board members.  See id. at 648-49.  The court based its decision on the fact that the

powers of officers is a subset of agency law, and agency law allows for the agent to act in an

emergency because it is assumed that the principal would want the agent to do so.  See id. at 648.

In Conlee Const. Co. v. Cay Const. Co., 221 So.2d 792 (Fla. App. 1959), a Florida court

allowed the president of a corporation to sue the corporate treasurer for an alleged usurpation of a

corporate opportunity, despite the board being deadlocked and not authorizing the litigation.  The

court held that, in the dispute, the corporation was standing to one side, while the two factions

settled their differences, and that a different ruling would effectively grant immunity to any officer

accused of malfeasance who was able to control half of the corporate board.  See id. at 795-97.  New

York courts have generally reached the opposite conclusion: "The presumption that the president

may sue without approval of the board of directors has no force when he attempts to sue one who

has equal control of the corporation with himself." Tidy-House Paper Corp. of N.Y. v. Adlman, 168

N.Y.S.2d 448, 451 (N.Y.A.D. 1957).

## LAW REGARDING RACKETEERING CLAIMS

Both federal and state law prohibit a variety of racketeering activities.  New Mexico's

racketeering laws are similar to the federal RICO statute, as the latter provided the model for the

former.  Both federal and state law provide for civil remedies for private individuals and

organizations harmed by racketeering activities.

## 1.      **The Racketeer Influenced and Corrupt Organizations Act.**

The federal RICO statute proscribes a wide variety of conduct.  Specifically, RICO provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

18 U.S.C. § 1962(a).  RICO further provides:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Id. § 1962(b)-(c).  "Racketeering activity" and "pattern of racketeering activity" are the key concepts underlying RICO, and the statute gives the two phrases precise meanings.

"Racketeering activity" is defined by 18 U.S.C. § 1962(1), which gives an exhaustive and extensive list of federal offenses that constitute racketeering activity, as well as a more general definition of state offenses that are considered racketeering activity.  The state crimes that are treated as racketeering activity include "any act or threat involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year."  Id. § 1962(1)(A). Among the list of federal predicate offenses are mail fraud, wire fraud, securities fraud, retaliating against a witness or victim, and engaging in monetary transactions in property derived from certain

specified criminal activity.  See id. § 1962(1)(B).  A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  Id. at § 1961(5).  In other words, a pattern of racketeering activity is any two racketeering acts within the space of ten years.

RICO allows for civil suits by "any person injured in his business or property by reason of violation of section 1962 of [RICO]."  18 § 1964(c).  RICO also mandates treble damages and recovery of reasonable attorney's fees for a successful claim.  See id. § 1964(c).  The Private Securities Litigation Reform Act of 1995, however, limited the scope of potential civil RICO causes of action.  In a civil RICO case, a racketeering violation cannot be founded "upon any conduct that would have been actionable as fraud in the purchase or sale of securities," unless the offender was actually criminally convicted of activity "in connection with the fraud."  Id. § 1964(c).  Additionally, several courts have held that other federal-fraud offenses, such as mail and wire fraud, can also not be used as predicate offenses where the underlying conduct would be actionable as securities fraud. See, e.g., Bald Eagle Area School Dist. v. Keystone Finance, 189 F.3d 321, 330 (3rd Cir. 1999); Blythe v. Deutsche Bank A.G., 399 F.Supp. 2d 274, 278-82 (S.D.N.Y. 2005).

The Supreme Court and the United States Court of Appeals for the Tenth Circuit have held that merely showing two acts of racketeering within the requisite ten-year period is not sufficient to show an actual pattern of racketeering activity.  "[T]he statement that a pattern 'requires at least' two predicates implies 'that while two acts are necessary, they may not be sufficient.'"  H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 237 (1989).  Rather, based upon RICO's legislative history and the ordinary usage of the word "pattern," a pattern of racketeering activity "requires the showing of a relationship between the predicates" and "the threat of continuing activity."  H.J. Inc.

v. Northwestern Bell Telephone Co., 492 U.S. at 239 (citation and internal quotation marks omitted).

As the Tenth Circuit has explained, both elements must be present.  Even if the racketeering

activities are part of a common scheme, there is no showing of a RICO claim if the plaintiff has

"failed to show that they pose a threat of continuing criminal activity."  Duran v. Carris, 238 F.3d

1268, 1271 (10th Cir. 2001).

### 2.       The New Mexico Racketeering Act.

The Racketeering Act, N.M.S.A. 1978, §§ 30-42-1 to 30-42-6 (2008), closely tracks RICO's

provisions.  The New Mexico statute makes it "unlawful for any person employed by or associated

with any enterprise to conduct or participate, directly or indirectly, in the conduct of the enterprise's

affairs by engaging in a pattern of racketeering activity."  N.M.S.A. 1978, § 30-42-4(C) (2008).  The

Racketeering Act also prohibits conspiring to engage in any violation of the Racketeering Act.  See

id. § 30-42-4(D).  Racketeering is defined as "any act that is chargeable or indictable under the laws

of New Mexico and punishable by imprisonment for more than one year, involving any of" several

enumerated offenses, including larceny, fraud, embezzlement, extortion, fraudulent securities

practices, and violations "of the provisions of Section 4 of the Money Laundering Act."  N.M.S.A.

1978, § 30-42-3(A).  A "pattern of racketeering activity" is defined as

> engaging in at least two incidents of racketeering with the intent of accomplishing
> any of the prohibited activities set forth in Subsections A through D of Section
> 30-42-4 NMSA 1978; provided at least one of the incidents occurred after the
> effective date of the Racketeering Act [1980] and the last incident occurred within
> five years after the commission of a prior incident of racketeering.

N.M.S.A. 1978, § 30-42-3(D).  The statute provides for a civil cause of action: "A person who

sustains injury to his person, business or property by a pattern of racketeering activity may file an

action in the district court for the recovery of three times the actual damages proved and the costs

of the suit, including reasonable attorney's fees."  Id. § 30-42-6(A).

It is unclear whether the Racketeering Act mirrors the federal RICO statute in requiring a showing of continuity and ongoing threat as part of demonstrating a pattern of racketeering activity. The Supreme Court of New Mexico has required showings of continuity to establish that an informal organization is an enterprise.  See State v. Rael, 127 N.M. 347, 351, 981 P.2d 280, 284 (1999).

## ANALYSIS

Any lawsuit brought by a corporation must be properly authorized.  See W. FLETCHER, supra, § 4216, at 13.  Because ADOT's board of directors has not authorized the corporation to sue Leslie Robins, the Court will enter judgment against ADOT's claims.  Biomoda  fails to adequately show the existence of predicate acts that would support a claim under RICO, so the Court will also dismiss its RICO claim.  Biomoda's state racketeering claims, however, are adequately pled.  Biomoda has demonstrated a pattern of racketeering activity under the Racketeering Act.

## I.     ADOT, THROUGH ITS PRESIDENT, DOES NOT HAVE AUTHORITY TO SUE ITS CHAIRMAN AND CEO.

Under Nevada law, for a corporation to commence litigation against an officer and director of the corporation, it must have its board of directors' authorization.  The Plaintiffs argue that the president has authority under the bylaws to initiate the present litigation.  This lawsuit, however – against the Chairman and Chief Executive Officer ("CEO") of the plaintiff corporation – cannot be pursued without the board of directors' affirmative permission.   The Plaintiffs' approach circumvents the legal channels Nevada has set up to deal with such a situation.  There being no dispute that ADOT's board of directors has not given affirmative authorization to bring this action, the Court will grant summary judgment to Leslie Robins.

### A.     THE BOARD OF DIRECTORS MUST AUTHORIZE LITIGATION, ABSENT SPECIAL CIRCUMSTANCES.

The law of the place of its incorporation governs a corporation's internal affairs.  See, e.g.,

Burks v. Lasker, 441 U.S. 471, 478 (1979); W. FLETCHER, supra, § 4223.50, at 31-32.  ADOT is

organized under the laws of Nevada, so it is Nevada law to which the Court must look to determine

whether it has the authority to sue.  The Nevada courts have not addressed an issue similar to the

one with which the Court is confronted – whether a corporation may sue one of its officers and

directors when there is no authorization from the board of directors because the board is divided and

cannot act.  The issue is an unusual one, and no clear answer can be divined from the Nevada

statutes and case law.  The Court must, however, make a decision.  The Court concludes that based

on Nevada law, a suit such as the present one cannot be brought absent authorization from the board

of directors.[3]

Nevada law vests "full control over the affairs of the corporation" in the board of directors,

subject to other statutory provisions and restrictions in the corporation's articles of incorporation.

N.R.S. 78.120.  Corporate officers have "such powers and duties as the bylaws may prescribe or as

the board of directors may determine."  Id. 78.130.  The default position is that the board of directors

must directly authorize litigation or else have delegated that power to someone else to exercise.

## B.   MICHAEL H. PETE DOES NOT HAVE DELEGATED OR INHERENT AUTHORITY TO AUTHORIZE THIS LAWSUIT.

The Plaintiffs seem to recognize that they must demonstrate some exception to the general

rule of board authorization.  Their arguments fall into two basic categories: (i) that Pete, as

---

[3] It may also be possible that a corporation could sue one of its own directors pursuant to
authorization by the shareholders.  Generally, of course, boards of directors are the primary authority
in a corporation on many matters, but it is ultimately the shareholders, the owners, whose word is
most important.  Whether shareholder authorization would be permissible under Nevada law is a
legal issue the Court need not address.  It may be that shareholder action would allow suit, or
Nevada law might require amendment to the articles of incorporation, or it might forbid granting
shareholder authority of the lawsuit.  There is, however, no shareholder authorization here, so the
Court will not deal with that possibility.

president, was delegated the authority to authorize litigation; and (ii) that Pete, as president, had the inherent authority to commence litigation.  Neither exception supports this lawsuit.

### 1.    Pete Does Not Have Delegated Authority.

In support of the delegated authority argument, the Plaintiffs argue that ADOT sued Leslie Robins on the orders of Pete, the president of ADOT.  Under ADOT's bylaws, the president is the "general manager and executive officer" of the corporation, "subject to the supervision and control of the Board of Directors."  ADOT Bylaws § 2.13.  The bylaws require that the president "direct the corporate affairs" of ADOT.  Id.  The Defendants argue that the management powers delegated to Pete do not include the power to bring litigation.  See Defendant's Supplemental Memo. at 2.

The Court does not find any authority to commence litigation against an officer or director in the bylaws language upon which Plaintiffs rely.  The language does not specifically grant the power to file a lawsuit.  The general supervisory powers delegated to the president may well encompass such power, but it would be of a more limited nature.

If the lawsuit were, for instance, bringing a breach of contract action against a buyer, or defending the corporation against a claim of employment discrimination, then the general language in the bylaws would likely allow for that authority.  Such litigation is part of the normal course of business with which companies have to deal occasionally.  The action ADOT is bringing now is very different in character.  ADOT is seeking to sue its own CEO and Chairman of its Board.  This lawsuit is not within the realm of ordinary business activities.  The authority to bring it cannot be found within the general language the bylaws use to define the powers of the president.

### 2.    Pete Does Not Have Inherent Authority.

The Plaintiffs next argue that Pete, as president, has the inherent power to authorize ADOT to sue Leslie Robins.  They argue that Pete has this power as a general matter, absent some

-19-

prohibition or restriction by the board, or at least in the more limited situation of an emergency.

Nevada law does not provide a president with the inherent authority to have his corporation sue one of its directors.  Although Nevada requires every corporation to have a president, it leaves it to the corporation's board of directors to define the president's power.  See N.R.S. 78.130.  The Plaintiffs urge the Court to construe Nevada's law to allow for the president to sue unless the board forbids it.  In support of this position, they note that the majority of states follow this rule.  See W. FLETCHER, supra, § 618, at 138-40.  Similar to the bylaws situation, however, the Court believes that this rule applies to general litigation matters, and not to extraordinary actions like the lawsuit against Leslie Robins.  Given the absence of any Nevada case law or statute addressing the issue, there is no compelling reason to extend this rule to Nevada corporations in such broad strokes.

The emergency situation theory that the Plaintiffs advance also cannot succeed.  The Plaintiffs argue that, when a board is deadlocked or otherwise prevented from acting, a corporate president has the inherent ability to authorize litigation to preserve the corporation's vital interests.  See Plaintiff's Supplemental Response at 3.  While this theory is a convincing one, it does not fit well with the facts of this case.

Some of the cases that the Plaintiffs cite for support do not involve a suit against one of the corporation's own directors.  For example, Management Technologies, Inc. v. Morris allowed emergency action in the face of a deadlocked board, but the action did not involve suing any of the deadlocked board members.  See 961 F.Supp. at 648-49.  The district court based its decision on the fact that the powers of officers is a subset of agency law, and agency law allows for the agent to act in an emergency.  The law assumes that the principal would want the agent to act in an emergency.  See id. at 648.

Other cases the Plaintiffs cite involve a situation similar to his one.  In one, a Florida state

court allowed the president of a corporation to sue the corporate treasurer for an alleged usurpation of a corporate opportunity.  The board was divided into two factions and deadlocked.  The court allowed the suit, reasoning that, in the dispute, the corporation was standing to one side, while the two factions settled their differences, and that a different ruling would effectively grant immunity to any officer accused of malfeasance who was able to control half of the corporate board.  See Conlee Const. Co. v. Cay Const. Co., 221 So.2d at 795-97.

The Defendants marshal cases of their own, citing to rulings from New York that have not allowed a president to sue other corporate officers when the board was deadlocked.  The New York Appellate Division, for example, came to the opposite conclusion that the Florida appellate court in Conlee Const. Co. v. Cay Const. Co. did.  The New York court held that "[t]he presumption that the president may sue without approval of the board of directors has no force when he attempts to sue one who has equal control of the corporation with himself."  Tidy-House Paper Corp. of N.Y. v. Adlman, 168 N.Y.S.2d at 451.

Neither line of cases, of course, has any controlling effect on Nevada.  The approach taken in New York, however, is the more persuasive.  The court's reasoning in Conlee Const. Co. v. Cay Const. Co. misses the point.  The corporation is not truly standing on the sidelines while two factions battle it out.  Rather, the interests of the corporation are directly in dispute.  The corporation is fighting itself.  Moreover, not permitting litigation without board approval in these situations is not tantamount to granting immunity to culpable conduct.  There are alternative avenues, such as shareholder derivative suits, that could impose liability.

This question ultimately boils down to an issue of agency.  Agency law generally gives the agent the authority to take action, including suing, to protect the principal's interests when for some reason the principal is incapable of giving authorization.  But extrapolating from this rule to the

proposition that a president can have a corporation sue a director turns agency law on its head.  A director, while not the principal, is a key figure with the authority to help determine what the principal's interests are.  Plaintiffs are, in effect, asking that an agent (the president) be allowed to order the principal (the corporation) to sue another agent (the director), to assert an interest about which the principal is ambivalent (because of the split in the board).  This result does not naturally arise from the silence of Nevada law on this topic, and there is no reason to assume that the Nevada courts would take the Plaintiffs' side.  The more appropriate and persuasive conclusion is that a president in Nevada cannot direct his corporation to sue one of its officers and directors unless the board has given its blessing.

The existence of alternative ways that redress can be sought bolsters this conclusion.  The Nevada statutes provide for several potential remedies to this impasse.  Their existence not only means that the Court is not cutting off all possible relief, it implies that the ruling the Plaintiffs seek would be contrary to Nevada law.  Under Nevada law, a single shareholder can bring a shareholder derivative suit to assert any right that a corporation is neglecting to prosecute.  See Nev. R. Civ. P. 23.1.  A shareholder can also seek the appointment of a custodian if the corporation's business "is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that a required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division."  N.R.S. 78.347(1)(a).  Ten percent of shareholders may also seek a dissolution of the corporation in certain circumstances, while two-thirds can remove a director.  See id. 78.335, 78.650.  Not all of these possibilities may be appropriate here, and presumably none are as desirable as direct action.  They are, however, what Nevada law provides.  They imply that Nevada sees these as the proper vehicles for resolving disputes similar to the one here.  Allowing the suit to proceed would effectively circumvent the

statutory framework Nevada has constructed and would amount to the creation of a new cause of action under Nevada law.

### C.     ROBINS CAN CONTEST ADOT'S AUTHORITY TO SUE HIM.

Finally, the Plaintiffs also argue that Leslie Robins "lacks the authority to pronounce that ADOT's lawsuit against him is *ultra vires*."  Response at 2.  They base this conclusion on the fact that the bylaws are silent on his role as CEO, while his position as Chairman of the Board involves only the power to "receive notices of director resignation, call special meetings of the Board, deliver notices of special meetings, and preside at Board meetings."  Response at 2.  Because a corporate officer has only the powers that the bylaws and the board of directors delegate to that position, see Berman v. Riverside Casino Corp., 247 F.Supp. 243, 245 (D. Nev. 1964), Leslie Robins thus lacks the power to declare a lawsuit unauthorized.

This argument misses the point.  Leslie Robins is not exercising any corporate authority to have the lawsuit declared unauthorized.  He is asking the Court to pronounce on whether ADOT has been authorized to commence litigation.  The Supreme Court of Nevada has addressed a similar question and declared:

> As a general rule the authority of an officer or agent to do a particular act or make a particular contract may be questioned only by the corporation, its stock-holders or creditors, and where they do not raise an objection, another third person can not do so or question the validity of the particular act or contract, except such third persons who may be injured thereby.

Porter v. Tempa Min. & Mill. Co., 93 P.2d 741, 745 (Nev. 1939)(quotation marks and citation omitted).

The general rule appears to be that third parties cannot challenge a corporation's authorization to sue.  See, e.g., W. FLETCHER, supra, § 4216, at 15; Farmers Union Oil Co. of New England v. Maixner, 376 N.W.2d 43, 47 (N.D. 1985).  Notably, most courts have stated that third

parties lack the right to challenge a corporation's authority to sue, but have not said that only the corporation itself can bring the challenge.  In contrast, albeit implicitly at times, courts have upheld the right of corporate insiders to challenge a corporation's authorization to sue.  See, e.g., Tidy-House Paper Corp. of N.Y. v. Adlman, 168 N.Y.S.2d at 449, 451-52 (allowing vice-president and fifty-percent shareholder to challenge the authority of corporation to sue him).  The Court is not aware of any case holding that an officer of a corporation cannot challenge the corporation's authority to sue him.

Leslie Robins is a shareholder, director, and officer of ADOT.  Given the Supreme Court of Nevada's holding in Porter v. Tempa Min. & Mill. Co. and the general trend of courts in other states, which preclude strangers to a corporation from challenging a corporation's authority to sue, but not insiders, Leslie Robins would be able to challenge whether ADOT had the authority to initiate a lawsuit against him.  Therefore, under Nevada law, Leslie Robins has properly challenged ADOT's authority to sue him.

To be able to sue a director and officer of the corporation, ADOT would need express authority from its board of directors.  There is no genuine dispute whether ADOT's board has expressly authorized this suit.  See Tr. at 31 (Boyd).  The board is split down the middle; while it does not condemn the suit, neither does it expressly authorize it.  As a result, Leslie Robins is entitled to summary judgment, and the Court will enter judgment in his favor on all the claims brought against him by ADOT, through Mr. Krehbiel.  See Fed. R. Civ. P. 56(c); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d at 1527.  The dismissal is without prejudice to ADOT re-bringing a suit against Leslie Robins with appropriate authority.

II.    **THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER THE NEW MEXICO RACKETEERING ACT, BUT NOT UNDER RICO.**

To state a claim under RICO and the Racketeering Act, the Complaint must allege that Leslie Robins was engaged in a pattern of racketeering, which led to harm to the Plaintiff. Leslie Robins challenges that the pleadings were deficient because they fail to set forth a pattern of racketeering activity, and moves the Court to dismiss them under rule 12(b)(6). The Court will grant the motion as to the RICO claim but deny it as to the Racketeering Act claim, and give Biomoda an opportunity to amend its RICO claims to conform to this opinion.

A.    **THE COMPLAINT FAILS TO ALLEGE A PATTERN OF RACKETEERING ACTIVITY UNDER RICO.**

To show a pattern of racketeering activity under RICO requires showing that four separate elements have been met: (i) there must be at least two acts that would qualify as racketeering activity; (ii) the acts must have occurred within ten years of each other; (iii) the acts must be related to each other or part of a common scheme; and (iv) the acts must pose a threat of ongoing or expanding criminal activity. Robins contends that the Complaint fails to adequately allege these essential elements of a racketeering claim, specifically, that Robins fails to demonstrate a pattern of racketeering activity. The Court agrees.

The Complaint lays out in significant detail a number of allegations, but ultimately fails to show that the acts alleged are predicate acts under RICO. Because the Court indicated at the hearing that it was inclined to deny the motion to dismiss and would notify the parties if it concludes otherwise, and because the Plaintiffs avoided relying on potential claims that were contained in their Complaint, the Court will grant leave to amend the Complaint with respect to the RICO claims.

Although not raised in the parties' briefs, at the hearing the Court asked whether rule 9(b) was applicable to RICO claims. See Tr. at 30 (Court). Mr. Bird, Plaintiffs' counsel, and Mr.

-25-

Bregman, Leslie Robins' counsel, both thought rule 9(b) applies.  See id. at 43 (Bird), 44 (Bregman).  It appears, however, based on the Court's own research, that the standards of rule 9(b) do not apply to RICO claims in this situation.  The Tenth Circuit has applied rule 9(b) only to RICO cases where the underlying racketeering acts were themselves acts of fraud that would be subject to rule 9(b) if pled independently as causes of action.  See Cayman Exploration Corp. v. United Gas Pipe Line Co., 873 F.2d 1357, 1362 (10th Cir. 1989).   In other areas of RICO, however, the standard, more generous requirements of rule 8 apply.   See Robbins v. Wilkie, 300 F.3d 1208, 1211 (10th Cir. 2002)(holding that plaintiff need only plead damages in RICO cases sufficient to meet rule 8's requirements).

In defending the sufficiency of their pleadings, the Plaintiffs expressly disavow reliance on any alleged acts of securities fraud, mail fraud, bank fraud, or wire fraud.  See Response at 5-6.  Securities fraud cannot be used to demonstrate a pattern of racketeering activity in civil cases.  See 18 U.S.C. § 1964(c).  Additionally, several courts have held that other federal fraud offenses, such as mail and wire fraud, also cannot be used as predicate offenses where the underlying conduct would be actionable as securities fraud.  See, e.g., Bald Eagle Area School Dist. v. Keystone Finance, 189 F.3d at 330; Blythe v. Deutsche Bank A.G., 399 F.Supp. 2d at 278-82.  Although neither the Tenth Circuit nor the District of New Mexico has apparently addressed the issue, the Plaintiffs specifically avoid using conduct that could be considered actionable securities fraud for their predicate offenses under RICO.

The Plaintiffs point to three particular incidents as establishing a pattern of racketeering activity.  The first incident is an unauthorized transfer of funds from Biomoda's account.  See Complaint ¶ 24, at 6-7.  Biomoda argues that this action would be engaging in a monetary transaction in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

A violation of 18 U.S.C. § 1957 is one of the predicate offenses for RICO.  See 18 U.S.C. § 1961(1)(B).  Section 1957, however, does not involve all transactions in criminally derived property.  The property must be derived from "specified unlawful activity."  18 U.S.C. § 1957.  This term is defined in 18 U.S.C. § 1956(c)(7).

Biomoda does not specify upon which offense among the many listed in 18 U.S.C. § 1956(c)(7) it is relying , and the Court does not see any definite candidates.  The likeliest option is probably wire fraud, but it is not clear from the Complaint that the elements of wire fraud are met.  Moreover, if wire fraud were the underlying offense, then rule 9(b) would apply, requiring particularity in the pleadings regarding the fraud.

Biomoda is relying on a predicate offense for racketeering that itself has a predicate offense requirement, and the most likely choice for this second predicate offense is a fraud offense.  Such a claim requires more than has been pled here.  Under the Bell Atl. Corp. v. Twombly standard, a complaint must give some indication of the grounds on which a claim rests.  See Robbins v. Oklahoma, 519 F.3d at 1248.  The Complaint has not sufficiently advised Leslie Robins with respect to this act.

Next, the Plaintiffs point to the alleged unauthorized diversion of $88,000.00 in ADOT stock and assets by Leslie Robins to an account payable to his son or to an entity controlled by his son.  See Complaint ¶ 26, at 7.  The Plaintiffs argue that this conduct would also be a violation of 18 U.S.C. § 1957 and a predicate offense.  This incident, however, is essentially just a variation on the first alleged offense, and suffers from the same defect.

The last allegations the Plaintiffs highlight are of threats of physical violence to Cousins, Verrity Gershin, and their families, over the various disputes here.  The Plaintiffs point to paragraph 24 of their Complaint, but the Court can find no indication of threats of violence there or anywhere

else in the Complaint. Cousins' affidavit contains such allegations, but the Court cannot properly consider such evidence on a motion to dismiss.

RICO requires that at least two predicate acts take place within ten years of each other. See 18 U.S.C. § 1962(1)(B); H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. at 237. Even if the Court considered the threats brought up in Cousins' affidavit, that would only be one predicate act. Without at least two predicate acts, the Complaint does not demonstrate a pattern of racketeering activity. Showing such a pattern is a requirement for a RICO claim, so failure to allege a pattern requires that the Court to dismiss the claim.

### B. THE COMPLAINT ALLEGES A PATTERN OF RACKETEERING ACTIVITY UNDER THE NEW MEXICO RACKETEERING ACT.

Showing a pattern of racketeering activity under New Mexico law is similar to doing so under RICO, although there are differences. Here, those differences prove to be more than cosmetic; they lead to a different result. Robins contends that the Complaint has failed to meet the requirements of the Racketeering Act in its allegations of a pattern of racketeering activity. The Plaintiffs' pleadings are, however, sufficient under the Racketeering Act.

In showing a pattern, the Plaintiffs can rely on "any act that is chargeable or indictable under the laws of New Mexico and punishable by imprisonment for more than one year, involving any of" several enumerated offenses, including larceny, fraud, embezzlement, extortion, fraudulent securities practices, and violations "of the provisions of Section 4 of the Money Laundering Act." N.M.S.A. 1978, § 30-42-3(A). At least two such offenses must be within five years of each other for there to be a pattern of racketeering activity. See id. § 30-42-3(D).

The Plaintiffs indicate six separate incidents constituted racketeering under the New Mexico law. See Response at 3-4. Two of these incidents are the same as those on which the Plaintiffs rely

for their RICO claim – the transfer of funds from Biomoda, <u>see</u> Complaint ¶ 24, at 6-7, and the diversion of ADOT assets and stock to Leslie Robins' son, <u>see id.</u> ¶ 26, at 7. The Plaintiffs contend that either action would be embezzlement, larceny, and fraud under state law. <u>See</u> Response at 3.

To take just one of these contentions, both actions would constitute embezzlement in New Mexico. In New Mexico: "Embezzlement consists of a person embezzling or converting to the person's own use anything of value, with which the person has been entrusted, with fraudulent intent to deprive the owner thereof." N.M.S.A. 1978, § 30-16-8(A). The Complaint alleges that Leslie Robins used his position to have funds and assets diverted for his own purposes. His alleged conduct in both situations would fit within the definition of embezzlement under New Mexico law. Either action would constitute a second degree felony because the sums involved exceeded $20,000. <u>See id.</u> § 30-16-8(D). The basic sentence for a second degree felony is nine years. <u>See id.</u> § 31-18-15(6). The alleged offenses, therefore, would both fall under the Racketeering Act's definition of racketeering. Although the precise dates of these occurrences is unstated in the Complaint, the context of the Complaint indicates that they must have both occurred between 2003 and the filing of the Complaint, which would be less than the statutory period of five years.

New Mexico law does seem to require elements of relatedness and future threat, although these come into the statute in a different way than in RICO. Under New Mexico law, the racketeering acts must be engaged in with an intent to violate any of subsections A through D of N.M.S.A. 1978, § 30-42-4. <u>See</u> N.M.S.A. 1978, § 30-42-3(D). These subsections include the word "enterprise," which the Supreme Court of New Mexico has used to bring in concepts like continuity. <u>State v. Rael</u>, 127 N.M. at 351, 981 P.2d at 284. This continuity requirement relates more to informal organizations as enterprises, however, which is a concept familiar to federal RICO law and is different from continuity in a pattern of racketeering. It is not clear, then, whether showing a

pattern of racketeering, especially when related to a formal, legal organization, requires a demonstration of relatedness and ongoing threat as RICO would.  It is ultimately immaterial, however, because even if they are required, that burden has been met.

The story told by the Complaint is one of numerous acts of malfeasance by Leslie Robins and others directed at diverting the assets of ADOT and Biomoda for personal enrichment, and particularly aimed at the dissolution of Biomoda so that ADOT could used its secured creditor status to take over all of Biomoda's assets.  See, e.g., Complaint ¶ 32, at 8-9.  The two racketeering acts of transferring funds from Biomoda, and the diversion of ADOT assets and stock to Leslie Robins' son, fall within this larger picture as two particular actions taken in furtherance of the overall goals of bankrupting Biomoda and enriching Leslie Robins and others.  It is true that the second racketeering act was apparently directed solely at ADOT, and the Court is dismissing ADOT from this lawsuit, but that does not change the result.  Not every act of racketeering need be aimed towards the same narrow goal, or directed at the plaintiff.  They are sufficiently similar to be related predicate acts.

The Complaint also shows an ongoing threat.  The overall plan as the Complaint alleges it is not oriented toward a discrete, narrow goal, such as a one-time act of embezzlement that has been completed.  Rather, the Complaint alleges an ongoing conspiracy to destroy Biomoda and seize its assets.  A scheme of this nature would be sufficient to represent a continuing threat.

The Complaint thus shows a pattern of racketeering activity pursuant to the Racketeering Act.  The other acts to which the Plaintiffs point also seem to be capable of showing a pattern under New Mexico law, but because the two already addressed in detail are sufficient, the Court will not elaborate on the other acts or other potential offenses besides embezzlement that could be found to constitute a pattern.

**IT IS ORDERED** that the Defendant Leslie S. Robins' Motion to Dismiss All Claims Brought by Advanced Optics Electronics, Inc. and Claims of Racketeering Brought by Biomoda, Inc. is granted in part and denied in part. The Court will convert the motion to a motion for summary judgment with respect to the claims that Plaintiff Advanced Optics Electronics, Inc., through Phil Krehbiel, has brought. The motion is granted with respect to those claims. The motion is also granted with respect to the RICO claim in Count VIII of the Complaint. The Court grants leave to Biomoda to amend its Complaint regarding that claim. The motion is denied with respect to the New Mexico Racketeering Act claim in Count VIII.

_____
UNITED STATES DISTRICT JUDGE

*Parties and Counsel:*

Thomas Bird
Spencer Reid
Keleher & McLeod
Albuquerque, New Mexico

– and –

Phil Krehbiel
Albuquerque, New Mexico

      *Attorneys for Plaintiff Biomoda, Inc.*

Thomas Bird
Spencer Reid
Keleher & McLeod
Albuquerque, New Mexico

– and –

Phil Krehbiel
Albuquerque, New Mexico

      *Attorneys for Plaintiff Advanced Optics Electronics, Inc.*

John Boyd
Matthew L. Garcia
Freedman Boyd Hollander
  Goldberg & Ives, P.A.
Albuquerque, New Mexico

      *Attorneys for Advanced Optics Electronics, Inc.*

Sam Bregman
Eric Loman
Bregman Law Firm
Albuquerque, New Mexico

      *Attorneys for Defendant Leslie S. Robins*

John W. Kearns
Coral Gables, Florida

      *Defendant pro se*

Alvin D. Robins
La Porte, Texas

      *Defendant pro se*